**Vincent BYRNES, Plaintiff,**

v.

**FRITO–LAY, INC., Defendant.**

No. 92–70077.

United States District Court,
E.D. Michigan, S.D.

Jan. 19, 1993.

Michael A. Conway, Royal Oak, MI, for plaintiff.

Dennis W. Archer, Dickinson–Wright, Detroit, MI, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GADOLA, District Judge.

On December 3, 1991, plaintiff instituted this action for wrongful discharge in violation of his state civil rights under the Elliott–Larsen Civil Rights Act. Mich.Comp. Laws § 37.2101 *et seq.* (1979). On January 7, 1992, defendant filed a notice of removal on the basis of diversity of citizenship between the parties and an amount in controversy exceeding $50,000.00. On November 16, 1992, defendant filed this motion for summary judgment. Plaintiff responded December 18, 1992. Defendant filed a reply December 30, 1992.

### I. Facts

Plaintiff began working for defendant in 1970 as a warehouse manager in Michigan. After a few months, plaintiff was promoted to route salesman and was supervised by Fred Cahill. With Cahill's assistance and encouragement and as a result of plaintiff's good performance, plaintiff was soon promoted to the position of district manag-

er. Cahill has testified that Cahill's supervisor, Dutch Froehlich, did not want to promote plaintiff to district manager because Cahill claims that "Froehlich in his mind wanted all managers to be 6 feet tall and 170 pounds." Cahill's Deposition at 11. However, Cahill convinced Froehlich that plaintiff was the best person for the position.

In 1971, Cahill was transferred to Cincinnati, Ohio. Shortly after his transfer, Froehlich called Cahill and told him to take plaintiff under his supervision in Ohio or Froehlich would fire him because plaintiff would not lose weight. Cahill agreed to take plaintiff, and plaintiff was transferred to Cincinnati. Plaintiff worked for defendant in Ohio under Cahill's supervision until 1977, when he left to work for Bic Pen Corporation. Plaintiff worked for Bic until 1979, when he made an agreement to return to defendant's employ, again under Cahill's supervision. In 1979, plaintiff was promoted by defendant to the position of regional sales manager for the Grand Rapids region of Michigan. After three years as the Grand Rapids regional sales manager, plaintiff worked in various locations in the Detroit area.[1]

From 1970 to 1988, (except for the two years plaintiff worked for Bic Pen) plaintiff was under the direct supervision of Cahill. Throughout those years, Cahill testifies that he "was constantly on [plaintiff's] case about a diet" because Cahill's bosses were constantly on Cahill's case about plaintiff's weight. Cahill's Deposition at 20. Nevertheless, Cahill was able to convince his bosses to repeatedly promote plaintiff, at least as far as the position of regional sales manager.[2] By March 20, 1988, plaintiff was earning $54,600.00 as a regional sales manager in Battle Creek, Michigan.

Cahill states that discussions among Cahill's bosses regarding plaintiff's weight continued even after plaintiff became a region manager. According to Cahill, one vice president of defendant, Craig Johnson, would regularly visit each region manager. On reporting back to Cahill, Craig Johnson would remark that plaintiff "was doing a good job and that everything in the operation looked consistent with the company policy, but [plaintiff] had to lose weight."[3] Cahill's Deposition at 21.

In 1988, Cahill was transferred to another position with defendant which took him out of the supervisory position over plaintiff. Plaintiff then was appointed a new supervisor, Mary Ellen Johnson.

Johnson's management style was different from Cahill's. Plaintiff testifies in his deposition that Johnson's style irritated him. According to plaintiff, Johnson

asked for no input and even at times when she did ask for input, you got the feeling that she was asking for the sake of asking, that she wasn't listening anyway. And typically whenever you expressed a different opinion or she asked what you thought, she would typically do the opposite anyway, you know. So you got to the point where you didn't feel like she really cared what you thought or what direction you wanted to go. This was the direction she wanted to go and this is what you are going to do. You also had the feeling that there was not a lot of compassion there.

Plaintiff's August 4, 1992 Deposition at 64. As an example of Johnson's lack of compassion, plaintiff relates how when plaintiff's daughter was involved in a collision while driving the company car issued to plaintiff, Johnson's first reaction was not to ask how was plaintiff's daughter but rather to question whether plaintiff's daughter had been authorized to be driving the company car. In addition, Johnson attempted to bill plaintiff for the damage to

---

**1.** Plaintiff claims that he was assigned to trouble regions to improve sales in those regions; once sales improved, plaintiff was reassigned.

**2.** The next position up in the company would have been division sales manager for the state of Michigan, the position held by Cahill and later, by Mary Ellen Johnson.

**3.** Mary Ellen Johnson also admits that Craig Johnson commented on plaintiff's weight. Johnson's Deposition at 70. However, Mary Ellen Johnson, plaintiff's supervisor, testifies also that there are "several big men" in defendant's company and that one of them, Ron Singer, is someone she promoted. *Id.*

the car. (Defendant corrected Johnson and the company paid for the repairs on the car.)

Plaintiff cites other actions of Johnson which irritated him; for example, plaintiff complains that Johnson would phone him every Monday and ask that he provide, from memory, specific details of the sales made in his region during the previous week. Plaintiff claims that such phone calls were intended to harass him and ultimately, to drive him from the company. Plaintiff's August 4, 1992 Deposition at 86. Johnson, however, claims that she called all of her regional managers on Mondays and requested of them the same information she requested of plaintiff; it was her responsibility, as division sales manager, to consolidate this information and pass it on to her supervisors. Johnson's Affidavit at 2.

During her supervision of plaintiff, Johnson gave plaintiff one salary appraisal and one performance appraisal. On the salary appraisal, Johnson rated plaintiff as "competent plus," which is one grade below the highest rating of "superior" (the appraisal that plaintiff had traditionally received from Cahill). At a meeting between plaintiff and Johnson wherein the performance appraisal was discussed, plaintiff claims that Johnson said to him that if he wanted to go anywhere with the company, plaintiff would have to lose weight.[4] Plaintiff's August 19, 1992 Deposition at 208.

On September 15, 1989, at his doctor's recommendation, plaintiff began a medical leave of absence. In his letter to defendant, plaintiff's doctor, Don Troyer, stated that stress related to plaintiff's work was contributing to the difficulty in controlling plaintiff's blood pressure. Exhibit F to Defendant's Reply. Plaintiff was informed by Michael Oliver, defendant's human resources manager, that plaintiff was enti-

tled to six months paid leave for his medical disability. Plaintiff and Oliver agreed that plaintiff also was entitled to an additional seven weeks of unused vacation time. Thus, plaintiff had until approximately the third week of April 1990 to treat his medical problem while still getting paid by defendant.

In October 1990, plaintiff was asked to meet with Mary Ellen Johnson and Michael Oliver in Lansing, Michigan. At the meeting, Johnson asked plaintiff if he could recommend a temporary or permanent replacement for plaintiff. Thus, plaintiff had notice that defendant was seeking someone to fill his position.

At defendant's suggestion, plaintiff underwent an "independent medical evaluation," performed by Dr. Philip Margolis. Dr. Margolis examined plaintiff twice: once on December 22, 1989, and once on January 5, 1990. Dr. Margolis stated that plaintiff was suffering from an emotional disability which plaintiff claimed was a result of plaintiff's former boss having been replaced by a woman. Exhibit C to Defendant's Reply Brief at 1. In his letter of January 22, 1990, Dr. Margolis stated that "Returning to work—in about three weeks with a male boss is recommended. It could be a gradual return or it could be done 'cold turkey'...." Id. at 2. Plaintiff claims that he had informed Dr. Margolis that no such position existed and that Dr. Margolis had told him that male supervision was only a "recommendation."

In late January 1990, Oliver telephoned plaintiff and asked that he clean out his desk and return the company car because a replacement had been hired to fill his position. Plaintiff asked Oliver if plaintiff had been fired, and Oliver replied that plaintiff had not been fired but that the position needed to be filled since plaintiff was un-

---

**4.** The purpose of the performance report was to let managers know what they would have to do to grow with the company; that is, what they could do to be considered for the next position. The court is not apprised of the contents of this written performance evaluation; however, plaintiff admits that Johnson's alleged statement about plaintiff's need to lose weight is not included in the written portion of the perfor-

mance review. Plaintiff's August 19, 1992 Deposition at 208–09. Defendant claims in its brief that in her deposition, Johnson denies having made this statement. Defendant's Brief at 16, n. 10. However, no page reference to Johnson's deposition or affidavit is offered by defendant; and the court is unable to locate such denial in the portions of these documents that are attached to the pleadings.

able to return to work. Plaintiff told Oliver that Dr. Margolis had indicated to plaintiff that plaintiff would be returning to work. Oliver replied that since Dr. Margolis had stated that plaintiff could not report to Mary Ellen Johnson, plaintiff's former position needed to be filled. Plaintiff offered to contact his own doctor and get a release to return to work; plaintiff, however, never pursued this action. In the same conversation, Oliver allegedly told plaintiff that he could draw disability until May and then collect long-term disability benefits.[5]

According to plaintiff, Oliver testified at his deposition that he had never before seen Margolis' letter of January 22, 1990. Plaintiff alleges that Margolis' letter does in fact authorize plaintiff's full return to work and that because the portion of the letter recommending plaintiff be supervised by a male was only a recommendation, it should not have prevented plaintiff from being returned to work under Mary Ellen Johnson's supervision.

On March 28, 1990, plaintiff's own doctor, Don Troyer, sent defendant a letter stating that Dr. Troyer recommended that plaintiff be returned "to part time work with a maximum of 20 hours per week ... His return would be on a trial-basis to be reevaluated in two weeks following resumption." Exhibit D to Defendant's Reply. Dr. Troyer requested that defendant respond "as to the availability of such an arrangement." *Id.* Michael Oliver responded by certified mail that defendant "does not have work that meets the job restrictions sited [sic] in your March 28 letter to me." Exhibit E to Defendant's Reply.

In April 1990, plaintiff applied for long-term disability benefits. Exhibit A to Defendant's Reply. On May 4, 1990, defendant terminated plaintiff's employ. Plaintiff, however, was not notified of his termination until July 3, 1990.

During all the years that plaintiff worked for defendant from 1970 through September 15, 1989, plaintiff was approximately five feet, eight inches in height and weighed approximately 230 to 240 pounds.

## II. Standard of Review

■ Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citation omitted). The Court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.,* 749 F.2d 1205, 1210–11 (6th Cir.1984).

■ The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 861 (6th Cir.1986). The initial burden on the movant is not as formidable as some decisions have indicated. The moving party need not produce evidence showing the absence of a genuine issue of material fact; rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific

---

**5.** Plaintiff alleges that Oliver failed to tell plaintiff that there was no guarantee that long-term benefits would be approved, and plaintiff was later denied such benefits.

facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg*, 801 F.2d at 861.

■ To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986),

There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted); *see also Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed. R.Civ.P. 50(a). *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. Consequently, a nonmovant must do more than raise some doubt as to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.*, 738 F.Supp. 214, 217 (E.D.Mich.1990), *aff'd*, 929 F.2d 701 (6th Cir.1991). The evidence itself need not be the sort admissible at trial. *Ashbrook v. Block*, 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings and affidavits. *Id.*

### III. Analysis

■ The Elliott–Larsen Civil Rights Act prohibits an employer from discriminating against an individual on the basis of, *inter alia*, weight or age. Mich.Comp.Laws § 37.2202(1)(a) (1979). Michigan courts have adopted the federal shifting burdens analysis of employment discrimination cases set forth in *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Dubey v. Stroh Brewery Co.*, 185 Mich.App. 561, 462 N.W.2d 758 (1990).

■ The plaintiff in a case alleging unlawful discrimination initially has the burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. *Id.* at 563, 462 N.W.2d 758. To do this, the plaintiff must show (1) that he is a member of a statutorily protected class; (2) that he was qualified for the job; (3) that he was discharged from the job; and (4) that he was replaced by someone outside the protected group. *Featherly, et al. v. Teledyne Industries, Inc.*, 194 Mich.App. 352, 358, 486 N.W.2d 361 (1992).

■ If the plaintiff is successful in establishing a *prima facie* case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action. *Dubey*, 185 Mich.App. at 563, 462 N.W.2d 758. Once the defendant articulates a legitimate reason for its action, the plaintiff then has the burden of showing by a preponderance of the evidence that the legitimate reason offered by defendant was merely a pretext for discrimination. *Id.*

■ In establishing a *prima facie* case of discrimination based on illegitimate criteria such as weight and age, the plaintiff need not prove that such illegitimate criteria were the sole reasons or even the main reason for the discharge. *Id.* at 563–64, 462 N.W.2d 758. The illegitimate factor alleged by the plaintiff does, however, have to be one of the reasons that made a difference in determining whether the plaintiff was discharged or not hired. *Id.* at 564, 462 N.W.2d 758.

■ In the case at hand, the court finds that plaintiff fails to establish a *prima facie* case of discrimination based on his weight or his age. From the facts as plaintiff alleges them, plaintiff cannot establish that he was qualified for the job at the time of his discharge. In March 1990, plaintiff's own doctor wrote to defendant and indicated that plaintiff was unable to return to work for more than twenty hours per week and that even that recommendation was dependent upon a review within two weeks. In April 1990, plaintiff completed and signed a form indicating that he was totally disabled and entitled to long-term benefits.

Between April 17, 1990, the day he filled out this form claiming total disability, and May 4, 1990, the day defendant terminated plaintiff, plaintiff does not allege that he made any efforts to retract his claim of long-term disability or to notify defendant that he was not, in fact, disabled from performing his job. Thus, the court finds that there is no genuine issue of material fact on the necessary element of whether plaintiff was qualified for the position from which he was discharged.

Even if plaintiff's factual assertions were enough to establish a *prima facie* case of employment discrimination, they are not enough to overcome the legitimate reason for plaintiff's termination offered by defendant; that is, that plaintiff's paid leave time had expired and that plaintiff still was disabled and unable to return to work.

■■■ There are three ways that a plaintiff can establish that a defendant's stated legitimate, non-discriminatory reasons for its actions are mere pretexts: (1) by showing the reasons had no basis in fact, (2) if they have basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were the factors, by showing that they were jointly insufficient to justify the decision. *Dubey,* 185 Mich.App. at 565–66, 462 N.W.2d 758. The soundness of an employer's business judgment may not be questioned as a means of showing pretext. *Id.* at 566, 462 N.W.2d 758.

Plaintiff can offer no proof that defendant's decision to terminate plaintiff's employment was based, even partially, on the fact that he was overweight or the fact that he was forty-three years old. Plaintiff's factual assertions, if true, indicate that, during the first sixteen years plaintiff worked for defendant (from 1970 to 1988, minus the two years plaintiff worked for Bic Pen), defendant's direct supervisor, Cahill, had had conversations with his superiors regarding their concern that plaintiff was overweight and should go on a diet. Only once, during that time, has plaintiff alleged that he was in danger of being

fired because he was overweight; that is, in 1971, approximately 19 years prior to plaintiff's actual termination, Dutch Froehlich told Cahill that Cahill must either take plaintiff under his employ in Cincinnati, or Froehlich would terminate plaintiff because plaintiff would not lose weight. It is unclear whether Froehlich was still employed by defendant at the time of plaintiff's discharge; in any event, plaintiff makes no allegation that Froehlich had anything to do with plaintiff's discharge in May 1990.

Plaintiff claims that he remained with the company for so many years only because Cahill was there to protect him from upper management. However, after Cahill was removed as plaintiff's supervisor in 1988, plaintiff continued working in the same position as regional manager until he took medical leave in September 1989.

Plaintiff claims that Mary Ellen Johnson's management style constituted harassment and that such harassment was directed at him because he is overweight. He makes the argument that her harassment caused him to take medical leave, and violated his civil rights because the leave ultimately resulted in his dismissal. The acts of alleged harassment cited by plaintiff are: Johnson's calling him every Monday and asking him about his sales production in a "tone of voice" that irritated him; Johnson's not being sympathetic when he told her his daughter had been involved in a collision while driving the company car; and Johnson's one alleged remark that if he wanted to move up in the company he must lose weight.

The court finds that plaintiff has alleged insufficient facts to state a claim for harassment based on weight. The issue of what a plaintiff must prove to establish harassment based upon weight has not yet been decided in the Michigan courts and is not specifically addressed in any Michigan statute. Michigan's Elliott–Larsen Civil Rights Act defines sexual harassment but does not define harassment that arises out of racial discrimination, or discrimination based on weight.[6]

---

**6.** Sexual harassment is defined as "unwelcome
sexual advances, requests for sexual favors, and

The United States Court of Appeals for the Sixth Circuit, in dealing with a claim of racial harassment brought under 42 U.S.C. § 2000(e) *et seq.*, has held that a plaintiff must prove (1) repeated slurs; and (2) the employer's tolerance and condonation of the situation. *Davis v. Monsanto Chemical Co.*, 858 F.2d 345, 349 (6th Cir. 1988) *cert. denied*, 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989). The court finds that it is likely that the Michigan courts, if deciding this case, would rule that in order to prove harassment based upon an unlawful discriminatory motive, a plaintiff must prove that repeated slurs or other harassing acts were directed at the plaintiff by the defendant or by someone in the defendant's employ; that such slurs or acts were related to the plaintiff's membership in a protected class; and that the employer tolerated and condoned the harassment.

In the case at hand, plaintiff has alleged at best one slur; that is, one remark by his supervisor that plaintiff should lose weight to further his career. Plaintiff offers no evidence, other than his speculative conclusions, that there was any link between Johnson's alleged acts of harassment and plaintiff's weight or age; and plaintiff offers no evidence that defendant, within the relevant time period (from December 1988 to September 1989),[7] when plaintiff was supervised by Johnson, condoned Johnson's alleged "harassment" of plaintiff, or that defendant was even aware that Johnson was harassing plaintiff. Thus, the court finds that there is no factual support for plaintiff's claim of harassment in violation of the Elliott–Larsen Act, and consequently, no genuine issue of material fact.

Plaintiff argues that the fact that defendant hired someone to fill his position before his disability leave had expired indicates that defendant fired plaintiff not because his leave had expired but because he was overweight and forty-three years old. Defendant responds to this argument by pointing out that plaintiff was not fired at the time the replacement was hired and that had plaintiff returned prior to the expiration of his leave, defendant would have done its best to find a position for plaintiff. Defendant further claims that plaintiff was a good employee and that plaintiff's supervisor, Mary Ellen Johnson, had been hoping he would return.

For the foregoing reasons, the court finds that plaintiff has failed to make out a *prima facie* case of discrimination based on weight or age. The court further finds that assuming plaintiff had alleged sufficient facts to support a *prima facie* case, there exists no genuine issue of material fact as to whether the acts of defendant's agent, Johnson, or defendant's decision to discharge plaintiff violated plaintiff's rights under the Elliott–Larsen Civil Rights Act.

### ORDER

Therefore, it is hereby ORDERED that defendant's motion for summary judgment is hereby GRANTED.

SO ORDERED.

other verbal or physical conduct or communication of a sexual nature." Mich.Comp.Laws § 37.2103(h).

**7.** A plaintiff in an action for employment discrimination under the Michigan Civil Rights Act must allege a violation of the act within the three-year period of limitations, not merely the continuing effect of past violations, to avoid the application of the statute of limitations. *Thomas v. Mich. Employment Sec. Comm'n*, 154 Mich. App. 736, 743, 398 N.W.2d 514 (1986). Plaintiff commenced this action December 3, 1991; therefore, the violations plaintiff alleges must have occurred after December 3, 1988. Any violations occurring before that date are not actionable unless plaintiff can show that they are part of a continuing pattern of discrimination. *See Sumner v. Goodyear Co.*, 427 Mich. 505, 541, 398 N.W.2d 368 (1986). Plaintiff has offered no evidence linking the alleged comments of Cahill's supervisors to Johnson's actions.